Argued June 20, affirmed July 30, petition for rehearing denied
August 23, petition for review denied October 23, 1973

JEROME HENRY BRUDOS, *Appellant, v.*
CUPP, *Respondent.*

512 P2d 1009

*Dale Pierson,* Salem, argued the cause and filed the brief for appellant.

*Thomas H. Denney,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and John W. Osburn, Solicitor General, Salem.

Before Schwab, Chief Judge, and Foley and Thornton, Judges.

SCHWAB, C. J.

In this post-conviction proceeding, petitioner seeks relief from judgments entered on his pleas of guilty to three counts of first degree murder.[1] He contends that: (1) he was denied effective assistance of counsel; (2) his guilty pleas were not knowingly and understandingly made; and (3) the prosecution failed

---

[1] We affirmed three consecutive life sentences imposed on petitioner. State v. Brudos, 3 Or App 239, 471 P2d 861, Sup Ct *review denied* (1970).

to disclose exculpatory evidence in its possession to him. The post-conviction court denied relief, and petitioner appeals.

Between his arrest in late May of 1969 and his guilty pleas made about a month later, petitioner was represented by two court-appointed attorneys, both experienced members of the bar. It is unclear exactly why petitioner believes the service rendered by his attorneys was inadequate. Apparently petitioner's principal complaint relates to one psychiatric examination of himself.

■ During the first few days following petitioner's arrest, his attorneys decided the only possible line of defense was insanity. Accordingly, between June 9 and June 25 petitioner was examined by five psychiatrists and two clinical psychologists. Their findings were unanimous—that petitioner was legally sane at the time of his commission of the murders.

Petitioner's adequacy-of-counsel claim relates to one of these examinations, that conducted by Dr. Suckow on June 9. Petitioner's attorneys advised him to describe completely and truthfully the circumstances of his crimes to Dr. Suckow and the other persons conducting examinations. Petitioner's attorneys were not present during Dr. Suckow's examination. During that examination, an intercom between the office occupied by Dr. Suckow and petitioner and another office was left open, and the district attorney and two police officers monitored the examination.

The decision of petitioner's attorneys to pursue exclusively an insanity defense does not in any way amount to inadequate assistance of counsel. His attorneys' conclusion was based on: (a) petitioner's detailed admissions to them that he had committed the

three murders; (b) an investigation by one of petitioner's attorneys that corroborated his admissions to them, and also revealed incriminating evidence that was presumably available to the prosecution; (c) petitioner had confessed to the police; and (d) petitioner's attorneys learned that the prosecution possessed a mass of highly incriminating physical evidence seized from petitioner's person and home, including, for example, photographs petitioner had taken of his victims before and after the murders. Faced with such overwhelming evidence of their client's guilt, the attorneys' decision to pursue an insanity defense was eminently reasonable.

The recommendation of petitioner's attorneys that he completely and truthfully describe the circumstances of his crimes during the psychiatric examinations does not in any way amount to inadequate assistance of counsel. The attorneys coupled this recommendation with an explanation that what was said during the examinations would not be confidential or privileged, and would be admissible at trial. Petitioner's attorneys had consulted with Dr. Rogers Smith, whom they described as the head of their "psychiatric team," and concluded the chances of petitioner's being diagnosed as insane would be maximized if petitioner would describe the bizarre circumstances of his crimes including, for example, his sexual assaults on his victims before and after their deaths, and his mutilation of their bodies. Also, petitioner's attorneys believed any additional evidence of their client's guilt that the prosecution gained from the examinations would be merely cumulative in light of what the prosecution already had, including petitioner's confession. There was nothing unreasonable about recommending full disclosure in these circumstances.

The failure of petitioner's attorneys to attend Dr. Suckow's June 9 examination of petitioner does not in any way amount to inadequate assistance of counsel. They, of course, received advance notice that the examination had been scheduled. They decided not to attend based on: (a) the recommendation of Dr. Smith that the examinations might more likely produce results favorable to the defense if they were not present; and (b) the belief that the only value in attending would be to prevent petitioner from making incriminating statements, and the further belief that no purpose was to be served by such a tactic when they had already decided that the only possible defense was insanity and petitioner was most likely to be found insane if he related the facts of his crimes in detail. There was nothing unreasonable about the attorneys not attending the psychiatric examination in these circumstances.

How petitioner bases an inadequacy-of-counsel claim on the fact that his examination by Dr. Suckow was monitored over an intercom by law enforcement officials escapes us. At the time of Dr. Suckow's examination petitioner had been in custody about 10 days and had been given *Miranda*[2] warnings "a dozen times" according to the district attorney. Petitioner's counsel in this court concedes that this was so. Before that examination petitioner was told by his attorneys that what he said would not be privileged. At the beginning of the examination Dr. Suckow told petitioner that what he said would not be privileged. We fail to see how monitoring the examination violated any of petitioner's rights in these circumstances.

[2] Miranda v. Arizona, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966).

■ ■ But in any event, even if we were to agree
with the post-conviction court that it "may not * * *
[have been] a desirable practice" to monitor the
examination, this is no basis for petitioner's in-
adequacy-of-counsel claim. The post-conviction court
found that petitioner's two attorneys did not know that
Dr. Suckow's examination was going to be monitored,
and had no connection with the fact that it was moni-
tored. This finding is supported by substantial evi-
dence, specifically, the testimony of the district at-
torney and the testimony of both of petitioner's
attorneys. The post-conviction court's findings, being
supported by substantial evidence, is binding on us.
*Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968).

Although the "advocate's work * * * is not
readily capable of later audit like a bookkeeper's,"[20]
cases do arise where, with the benefit of hindsight, it
appears that a certain course of action would have
been preferable to that actually followed by a criminal
defense attorney. This is not such a case. Even with
the benefit of hindsight, we cannot imagine any way
that petitioner's attorneys could have done more on
his behalf. Their performance was at the opposite end
of the spectrum from inadequate assistance. In pas-
sing we note that the same is true of the performance
of the attorney appointed by the court to represent
the petitioner in this post-conviction proceeding.

■ Petitioner's next contention is that his guilty
pleas were not knowingly and understandingly made.
Specifically, he claims he did not understand the mean-
ing of the word "deliberation" as used in the first
degree murder charges. This is a question of fact
which the post-conviction court resolved against peti-

---

[20] *Moore v. United States,* 432 F2d 730, 737 (3d Cir 1970).

tioner, and the record supports the post-conviction court's finding. *Ball. v. Gladden,* supra.

Petitioner filed three written petitions to enter guilty pleas. Each stated that: (a) he had received a copy of the indictment charging first degree murder; (b) one element of that crime was that he did kill another "purposely and with deliberate malice"; (c) he had read the indictment and discussed it with his attorneys; and (d) he fully understood the charges.

The transcript of the proceedings at which petitioner's guilty pleas were orally made and accepted, although revealing some confusion, is consistent with petitioner's written representations. Thus, petitioner first admitted abducting and strangling Karen Sprinker, but when asked, "Did you do this with a deliberate plan in mind?", he replied, "That I don't honestly have an answer for." And petitioner admitted abducting and strangling Jan Whitney, but when asked if the act was deliberate, he replied, "I really don't know. It just happened." Later, however, petitioner admitted abducting and strangling Linda Salee, admitted that he had killed her with deliberation and premeditation, and admitted that there was no difference between his state of mind at the time he killed her and his state of mind at the time he killed the other two.

"THE COURT: Did you kill Linda Dawn Salee with deliberation and premeditation?

"THE DEFENDANT: Yes, sir.

"* * * * *

"THE COURT: Is there any difference in the deliberation or the premeditation that was in your mind at the time you strangled Linda Dawn Salee than there was when you strangled Jan Susan Whitney?

"THE DEFENDANT: No, sir.

"THE COURT: Was there any difference in your deliberation or premeditation when you killed Karen Elena Sprinker than there was when you killed Linda Dawn Salee?

"THE DEFENDANT: No, sir.

"THE COURT: One final question, Mr. Brudos. Are you stating to me at this time, in each of these cases, that you did the acts alleged with deliberation and with premeditated malice?

"THE DEFENDANT: Yes, sir."

In the post-conviction court petitioner claimed he answered the above questions as he did only because one of his attorneys "elbowed" him and told him to answer in that manner. The post-conviction court was not required to believe this claim.

Given the contents of petitioner's written petition to enter pleas of guilty and his oral testimony when the pleas were made and accepted, the post-conviction court did not err in finding that petitioner's pleas were made knowingly and understandingly.

■ Petitioner's final claim is that the prosecution had evidence that would have tended to establish his innocence but did not disclose the existence of this evidence to petitioner or his attorneys. The evidence in question is a single undated photograph which, according to testimony in the post-conviction court, is a picture of one of the murder victims that was taken in petitioner's house.

It is impossible to comprehend the analysis that leads petitioner to the conclusion that this photograph could possibly constitute evidence of his innocence. In any event the post-conviction court found that the photograph, along with all other evidence in the state's

possession, was shown to petitioner's attorneys before petitioner plead guilty. This finding is supported by substantial evidence, specifically, the testimony of the district attorney and the testimony of both of petitioner's attorneys. Indeed, even petitioner testified he saw the photograph "briefly" before pleading guilty— long enough to see that it was a picture of a woman and that it had been taken in his house.

Affirmed.